**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**JON CRAIG NELSON,**

      **Petitioner,**

**v.**                                     **Case No. 8:19-cv-1335-MSS-AEP**
                                            **Case No.: 8:14-cr-58-MSS-AEP**

**UNITED STATES OF AMERICA,**

      **Respondent.**

_____/

**<u>ORDER</u>**

This cause comes before the Court on Petitioner Jon Craig Nelson's *pro se* Motion

under 28 U.S.C. Section 2255 to Vacate, Set Aside, or Correct Sentence.  (Civ. Docs. 7–9)

The United States responded in opposition, and Nelson replied.  (Civ. Docs. 16 and 18)  For

the reasons stated herein, Nelson is not entitled to relief.

**I.**      **Background**

Following a 15-day trial, a jury convicted Nelson of (1) conspiracy to commit mail and

wire fraud in violation of 18 U.S.C. § 371, (2) conspiracy to commit money laundering in

violation of 18 U.S.C. § 1956(h), (3) four counts of mail fraud in violation of 18 U.S.C. §§

1341 and 2, and (4) four counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2.  Nelson

was sentenced to 96 months' imprisonment.

Nelson appealed, challenging the sufficiency of the evidence.  The circuit court rejected

the challenges and affirmed Nelson's convictions.  *United States v. Nelson*, 884 F.3d 1103, 1110

(11th Cir. 2018).  The circuit court set forth the facts of this case as follows:

> In 2011 [co-defendant Michael Skillern] and Nelson started a company
> called Own Gold LLC for the purpose of mining, processing, and

selling gold. Own Gold's website and marketing materials represented that it was a "gold producer" with mining claims worth some $81 billion. For the next two years Own Gold used a telemarketing firm to execute contracts with hundreds of people who believed that they were actually buying gold. Those contracts specified the amounts of gold purchased and prices, and represented that customers could retrieve their gold ore "at any time after the execution and payment of consideration" by "appear[ing] in person" at the mining site. Otherwise, Own Gold had 360 days to deliver the gold; if it failed to do so, it would refund the purchase price. All told, Own Gold accepted 441 orders and collected more than $7.3 million from customers.

As it turns out, Own Gold's representations about its gold production were, well, *mis*representations. From its inception in 2011 until it stopped executing sales contracts with customers in 2014, Own Gold appears to have produced less than six ounces of gold from its own mining operations. In light of its near-total failure to produce any gold from its own mines, Own Gold resorted to trying to fulfill customers' orders by purchasing gold from third parties. Even so, despite taking orders for 5,912 ounces of gold and accepting more than $7.3 million from its 351 customers, Own Gold ultimately delivered a mere 150 ounces—valued at $241,000—to 20 customers. Own Gold refunded only $35,022 to four customers; none of the other orders was either fulfilled or refunded. Meanwhile, Skillern collected approximately $488,000, Nelson bagged about $300,000, and Own Gold's telemarketing firm netted a whopping $5.1 million over a two-year period.

## II.   Discussion

Nelson now moves to vacate his convictions and sentence, asserting seven grounds of ineffective assistance of both trial and appellate counsel. The United States concedes that Nelson's Section 2255 motion is timely and that his claims are cognizable.

To succeed on an ineffective assistance of counsel claim, a petitioner must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When evaluating performance, the district court must apply a "strong presumption" that counsel has "rendered adequate assistance and [has] made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Ci. 1995) (*en banc*) (citations omitted).

To establish deficient performance, a petitioner must show that "no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citations omitted). Indeed, "it does not follow that any counsel who takes an approach [the court] would not have chosen is guilty of rendering ineffective assistance." *Waters*, 46 F.3d at 1522.

A petitioner demonstrates prejudice only when he establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Courts "are free to dispose of ineffectiveness claims on either of its two grounds." *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 2004).

### A. Ground One: Whether counsel was ineffective for failing to seek dismissal of the wire and mail fraud counts

#### 1. Wire Fraud

Nelson asserts that counsel was ineffective for failing to move to dismiss the wire fraud counts. Counts 7 through 10 charged that Nelson and others engaged in a scheme to defraud

and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. §§ 1343 and 2.  The scheme was executed by wire transfers on different dates between Own Gold's bank accounts in Houston, Texas, to bank accounts held by co-conspirator Naadir Cassim in Orlando, Florida.  Crim. Doc. 1 at 26–28.

Nelson contends that the wire fraud charges should have been dismissed because no wire transmissions traveled directly from Houston to Orlando, as alleged in the indictment. Rather, "[t]here were a series of *separate* and *distinct* transmissions, from the commercial banks in Houston, to the [Federal Reserve Bank] in Dallas[,] [f]rom the [Federal Reserve Bank] in Dallas to the [Federal Reserve Bank] in Atlanta, and from the [Federal Reserve Bank] in Atlanta to the wire room of Seaside National [Bank] in Orlando."  Civ. Doc. 9 at 9–10 (emphasis in original).  He argues that the United States was required to charge each of these wire transmissions as a "separate offense" with a "precise wire origination and destination of each transmission."  He asserts that because the United States improperly charged a series of separate wire transmissions as a single wire transmission, the charged offenses are "non-existent."  *Id.*  He contends that counsel was ineffective for failing to seek dismissal of the wire fraud counts based on this argument.

Nelson cannot demonstrate that counsel was ineffective for failing to assert this argument in a motion to dismiss or that he was prejudiced by counsel's performance.  Nelson cites no authority that requires the United States to charge the wire transmissions as he proposes.  The United States was not required to prove that the wires travelled directly from Houston to Orlando.  Rather, it was required to prove that "some communication . . . to help carry out the scheme to defraud" was transmitted in interstate commerce.  Eleventh Circuit

Pattern Jury Instructions (Criminal), Offense Instruction 51; Crim. Doc. 274 at 25. Consequently, Nelson fails to demonstrate that no competent counsel would have failed to seek dismissal of the wire fraud counts on this basis.

Furthermore, even under Nelson's theory, a single transmission, in fact, crossed state lines from Georgia to Florida. Nelson suffered no prejudice because the jury could have relied on the interstate wire transmission from the Federal Reserve Bank in Atlanta to Seaside National Bank in Orlando to reach its verdict that some communication to help carry out the fraudulent scheme was transmitted in interstate commerce. Therefore, Nelson fails to demonstrate a reasonable probability that, if counsel sought dismissal of the wire fraud counts, the result of the proceeding would have been different.

Nelson's reliance on *Boruff v. United States*, 310 F.2d 918 (5th Cir. 1962), which concerned whether venue was proper, is misplaced. In *Boruff*, the victim sent funds from Michigan to Atlanta, Georgia, by Western Union telegraph. The next day, by separate transaction, the defendant sent the funds from Atlanta (in the Northern District of Georgia) to Thomasville (in the Middle District of Georgia). The victim did not intend to send the funds to Thomasville. The Fifth Circuit concluded that venue in the Middle District of Georgia was improper because the only interstate transfer was from Michigan to Atlanta, and the transfer was complete upon its receipt in Atlanta. *Boruff* is factually distinguishable because here the trial evidence demonstrated that the wires, as charged in Counts 7 through 10, were single transactions originating in Houston and ending in Orlando. Crim. Doc. 431-8 at 125–34. *See also United States v. Curtis*, No. 12-1788, 2013 WL 3049352, at *6 (S.D. Tex. June 17, 2013) (finding that venue was proper because "[u]nlike the situation in *Boruff,* this case involved wire transfers that were sent from out-of-state banks to banks located in the

Southern District of Texas as single transactions.  It does not matter whether the transfers passed through the Federal Reserve Bank in Dallas on their way from out of state into the Southern District; each transfer was sent as a single transaction that was not completed until it arrived at the destination bank account in this District.").

### 2.   Mail Fraud

Nelson asserts that counsel was ineffective for failing to move to dismiss the mail fraud counts in Counts 3 through 6 because the mailings were not in furtherance of the fraud scheme.  Evidence at trial established that, after a customer executed a sales contract to purchase gold from Own Gold and remitted payment, the company mailed a Certificate of Ownership to the customer that memorialized the purchase.  Nelson now argues that "the mailing of Certificates of Ownership, as much as three months after receipt of the funds, is too attenuated [and] too long after the receipt of the money" to be an act in furtherance of the scheme.  He argues that the Certificates of Ownership could not be the "but for" connection to the scheme because the Certificates were mailed three months after the customers remitted payment.  Civ. Doc. 9 at 12–13.

"To be part of the execution of the fraud, . . . the use of the mails need not be an essential element of the scheme.  It is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) (citations and alterations omitted).  However, "[t]here does come a point at which a mailing will no longer be considered part of the execution of a fraudulent scheme.  After a scheme has reached fruition mailings generally cannot have been for the purpose of executing the scheme." *United States v. Hill*, 643 F.3d 807, 859 (11th Cir. 2011) (citations omitted).  Also, "[u]nder the lulling exception, mailings are sufficiently a part of the execution of a fraudulent

6

scheme if they are used to lull the scheme's victims into a false sense of security that they are not being defrauded, thereby allowing the scheme to go undetected." *Id.*

Nelson cannot demonstrate that counsel was ineffective for failing seek dismissal of the mail fraud counts or that he was prejudiced by counsel's performance. On direct appeal, the circuit court summarily rejected Nelson's challenge to the sufficiency of the evidence supporting the mail fraud counts and affirmed his convictions. *Nelson*, 884 F.3d at 1110. Furthermore, trial evidence supported the conclusion that the Certificates of Ownership advanced the fraud scheme because they caused customers to believe that their gold purchase was legitimate. Doc. 431-3 at 114 ("I understood it to be a certificate in my benefit of ownership of 300 ounces of ore gold."); Doc. 431-4 at 172 ("[The Certificate of Ownership indicated] [t]hat I was the owner of 56 ounces of . . . gold.").

The cases Nelson cites are factually distinguishable. *See United States v. Maze*, 414 U.S. 395 (1974) (reversing mail fraud convictions because the merchants' mailing of sales slips to the bank, which would forward the slips to the victim for payment, did not further the credit card fraud scheme); *Parr v. United States*, 363 U.S. 370, 391–92 (1969) (reversing mail fraud convictions because the mailings contained no false pretense or misrepresentation to obtain money); *Kann v. United States*, 323 U.S. 88, 94 (1944) (reversing mail fraud convictions because "the mere clearing of a check" by a bank after the bank released the funds to the defendants was "immaterial" to the scheme). Here, the fraudulent Certificates of Ownership furthered the scheme, even though they were mailed months after the customers remitted payment, because they caused the customers to believe their purchases were legitimate.

Nelson fails to demonstrate that counsel was ineffective for failing to seek dismissal of the wire and mail fraud counts or that he was prejudiced by counsel's performance. Accordingly, he is not entitled to relief on Ground One.

**B.    Ground Two: Whether counsel was ineffective for failing to advise Nelson to enter a plea agreement**

Nelson asserts that counsel was ineffective for failing to advise him to enter a plea agreement due to the strength of the government's case. He states that counsel never explained the legal significance of the government's evidence, never reviewed the discovery with him, and never discussed plea offers with him. He states that, if counsel had advised him properly, there was a "reasonable probability" he would have entered a plea agreement because "it would probably have been [his] best alternative." Civ. Doc. 8 at 1. He argues that an evidentiary hearing is necessary because counsel does not dispute his assertions. Civ. Doc. 18 at 10.

However, counsel emphatically disputes Nelson's assertions and states that he "met with Mr. Nelson on numerous occasions, reviewed all discovery with him, and answered all of his questions." Attached to counsel's affidavit are letters from counsel's office to Nelson which included batches of the government's discovery on discs. The record also contains a plea agreement offered by the government, and email correspondence from counsel to the government stating that Nelson declined to accept the plea agreement. Civ. Doc. 16-1 at 3 and 24–93.

Even accepting all of Nelson's assertions as true, he fails to show he was prejudiced by counsel's performance. When a defendant challenges a not-guilty plea based on ineffective assistance of counsel, he "must show that there is a reasonable probability that, but for counsel's errors, he would have pleaded guilty and would not have insisted on going to trial."

*Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995) (citations and alterations omitted). Nelson does not meet this burden.  His assertions that there was a "reasonable probability" that he would have pleaded guilty and that the plea agreement was "probably" his best alternative are contradicted by his other assertions that he has "never cheated anyone" and that he "wanted to testify and tell the jury" of his innocence.  Civ. Doc. 8 at 1 and 4.  Furthermore, Nelson "offer[s] no further proof to show that he would have accepted the [government's] plea [agreement] . . . absent [counsel's] alleged errors."  *Coulter*, 60 F.3d at 1504.  Nelson's noncommittal, "after the fact [assertion] concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer."  *Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991).

Furthermore, Nelson is not entitled to an evidentiary hearing.  "It is well-settled that the district court is not required to grant an evidentiary hearing when the defendant's claims are affirmatively contracted by the record evidence, nor is a hearing required if the claims are grounded upon generalizations that are unsupported by the record evidence."  *Rosin v. United States*, 786 F.3d 873, 878 (11th Cir. 2015).  Nelson did not accept responsibility and continued to profess his innocence at sentencing, on appeal, and in his Section 2255 motion.  *See id.* (affirming denial of a Section 2255 without an evidentiary hearing when the defendant "refused to accept responsibility and adamantly professed his innocence during all stages of his criminal proceedings").   At sentencing, Nelson sought to avoid responsibility by explaining that he "involved [himself] with something beyond [his] ability to control in spite of [his] most earnest intentions and best possible efforts."  Crim. Doc. 428 at 25.  On appeal, he maintained his theory of defense that he acted in good faith and that alleged misrepresentations were the fault of erroneous legal advice.  *United States v. Nelson*, No. 16-

14253-EE, 2017 WL 74314 (11th Cir. Jan. 4, 2017) (Initial Brief of Appellant). In his Section 2255 motion, Nelson continues to deny responsibility, stating that he "never cheated anyone." Civ. Doc. 8 at 4. Thus, the record contradicts Nelson's position that he would have accepted a guilty plea and not insisted on going to trial but for his counsel's alleged errors. *See Rosin*, 786 F.3d at 879 (without an evidentiary hearing, rejecting the petitioner's assertion that he would have accepted a guilty plea "in the absence of any evidence other than his own conclusory after-the-fact assertion—and given the record evidence contradicting it").

### C.   Ground Three: Whether counsel was ineffective for failing to prepare adequately for trial and for failing to challenge effectively the government's evidence at trial

Nelson asserts that counsel was ineffective both before and during trial. He contends that counsel failed to investigate facts and witnesses, failed to cross-examine effectively the government's witnesses, and failed to challenge effectively the government's faulty evidence. Finally, he asserts that he committed no "guilty act" that is required to sustain a conviction. Civ. Doc. 9 at 16–21.

In particular, Nelson argues that he did not author the July 12, 2012 letter that Own Gold sent to customers, informing them that the company had commenced processing ore, although his name is located in the letter's closing salutation. As evidence that he did not author the letter, Nelson points to the testimony of a special agent who confirmed that Nelson was not included in company emails concerning the letter. Crim. Doc. 431-5 at 183.

Next, Nelson argues that he did not draft a press release celebrating the delivery of gold to the company's first customer. As evidence that he did not author the press release, Nelson again points to the testimony of the same special agent who confirmed that a draft of the press release was sent to—not from—Nelson. Crim. Doc. 431-6 at 16–17. He states that,

without his knowledge, co-defendant Cassim issued letters, press releases, and website notices with Nelson's name.  Civ. Doc. 8 at 2.  He argues that the government falsely attributed the misrepresentations contained in the letter and press release to him, and that the presentence investigation report simply "regurgitates" the government's faulty argument.  Civ. Doc. 9 at 16–17.

Nelson states in his affidavit that, although he provided documents to counsel to substantiate that he did not author the letter or press release, counsel failed to present any defense.  He states there was "very little follow-up" or "notetaking."  He also states that he requested that counsel interview and subpoena co-defendant Skillern's father and ex-wife, who could have testified about Nelson's legitimate efforts to locate gold.  Civ. Doc. 8 at 2–3.

Counsel disputes Nelson's assertions.  He states that "[t]he entire discovery was reviewed with Mr. Nelson in preparation for trial and during trial and all of his questions were answered at all junctures of the proceedings."  He states that "the best defense was presented on [Nelson's] behalf" and that "the trial record . . . speaks for itself."  Civ. Doc. 16-1 at 7–8.

The decision whether to present a line of defense, or even to investigate it, is a matter of strategy and is not ineffective unless the petitioner can prove that the chosen course was unreasonable.  *Hardwick v. Crosby*, 320 F.3d 1127, 1162 n.146 (11th Cir. 2003).  Similarly, "no absolute duty exists to investigate particular facts or a certain line of defense" so long as the decision to conduct or not conduct an investigation is reasonable.  *Chandler*, 218 F.3d at 1317.  Counsel is not "required to 'pursue every path until it bears fruit or until all hope withers.'"  *Williams v. Head*, 185 F.3d 384, 387 (11th Cir. 1994).  "A decision to limit investigation is 'accorded a strong presumption of reasonableness.'"  *Mills v. Singletary*, 63 F.3d 999, 1021 (11th Cir. 1995).

11

Nelson fails to demonstrate that counsel's overall performance was deficient or that he was prejudiced.  Nelson's claim presents more like another assertion of his innocence (which the jury rejected) and another challenge to the sufficiency of the evidence (which the circuit court rejected), rather than a true claim of ineffective of assistance of counsel.  The record shows that counsel's performance before and during trial fell well within the wide range of professional competence.  Furthermore, Nelson's assertion that other witnesses could have provided exculpatory testimony is pure speculation.  *See Brownlee v. Haley*, 306 F.3d 1053, 1060 (11th Cir. 2002) ("[S]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.") (citations omitted).  Accordingly, Nelson is not entitled to relief on Ground Three.

### D.    Ground Four: Whether counsel was ineffective for failing to object to jurors sleeping during trial

Nelson asserts that counsel was ineffective for failing to object and move for a mistrial when jurors were sleeping on multiple occasions during trial.  In his affidavit, Nelson states that he "noticed at least four jurors sitting with their eyes closed and not moving at various times during the trial" who "appeared to be sleeping."  He states that he saw "one juror nudge another to wake him up on one occasion."  He states that he notified counsel that jurors were sleeping, but counsel never objected.  Civ. Doc. 8 at 4–5.  In response, defense counsel states that he observed no jurors sleeping during the trial and that Nelson never notified him of sleeping jurors.  Civ. Doc. 16-1 at 9.

"'Defense counsel has a duty to call a juror's inattentiveness to the court's attention.'" *United States v. Mathis*, 554 F. App'x 856, 857 (11th Cir. 2014)[1] (quoting *United States v. Curry*,

---

[1] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. Rule 36-2.

471 F.2d 419, 422 (5th Cir. 1973)) (alterations omitted).  However, "'[t]here is no per se rule requiring an inquiry in every instance of alleged juror misconduct.'"  *Mathis*, 554 F. App'x at 857 (on direct appeal, finding that the district court did not plainly err by not questioning or replacing an allegedly sleeping juror) (alterations omitted) (quoting *United States v. Hernandez*, 921 F.2d 1569, 1577 (11th Cir. 1991)).  Rather, the district court is afforded "broad discretion . . . [when] confronted with . . . an allegation of juror misconduct[,]" including "the initial decision of whether to interrogate jurors."  *United States v. Yonn*, 702 F.2d 1341, 1345 (11th Cir. 1983).

The parties identify one instance in the record when the district court acknowledged juror inattentiveness.  On the sixth day of trial, the following exchange occurred (Crim. Doc. 431-5 at 33–34):

| | |
|---|---|
| THE COURT: | How much longer with this witness? |
| AUSA: | I'd say about 15 minutes, Your Honor. |
| THE COURT: | We're going to have to take a break, we're losing our jury. So let's take about a 15- minute break until about 10:30.  Shake a leg, take a walk around the block. |
| | (Jury excused from the courtroom.) … |
| THE COURT: | [AUSA], I know you are trying to be methodical, but if you move any slower, you'll be standing still.  The jury is dosing.  I don't want to have to keep waking them up and embarrassing them, but you're controlling this, so you're going to have to get enthusiastic or expect that they're not going to hear some of what you're trying to convey. |
| AUSA: | Thank you, Your Honor. |

Nelson is not entitled to relief on Ground Four because he cannot demonstrate that he was prejudiced by counsel's failure to object, or move for a mistrial, due to sleeping jurors.

When the district court observed "dosing" jurors, it ordered a brief break to allow jurors a reprieve from the testimony.  The court also advised the government's counsel to alter her questioning in order to keep the jurors' attention.  These steps are well within the district court's broad discretion to address juror inattentiveness, and the court was not required to interrogate the jurors.

Furthermore, Nelson has not demonstrated a reasonable probability that the outcome of the trial would have been different if counsel had objected, requested an inquiry, or moved for a mistrial.  Nelson does not provide any details concerning the four sleeping jurors he claimed to have witnessed, such as when he witnessed them sleeping or when he notified counsel.  Also, Nelson points to no other instance in the 15-day trial in which the district court *sua sponte* identified or addressed inattentive or sleeping jurors.  Furthermore, Nelson does not demonstrate how he was prejudiced by jurors' alleged inattentiveness to the *government's* witness on direct examination *by the government*. *See Clarke v. McNeil*, 2010 U.S. Dist. LEXIS 141652, at *18 (S.D. Fla. Oct. 7, 2010) (concluding there was no reasonable probability that the outcome of the case would have been different if counsel had objected to a sleeping juror, when the juror allegedly slept for a brief period of time and during the state's closing argument), *adopted in part*, 2011 U.S. Dist. LEXIS 18864, at *23 (S.D. Fla. Feb. 25, 2011); *Torres-Bonilla v. United States*, No. 15-23204, 2016 U.S. Dist. WL 1166597, at *10 (S.D. Fla. Feb. 17, 2016), *adopted*, 2016 WL 11665896, at *1 (S.D. Fla. Mar. 3, 2016) (concluding that petitioner failed to show how the outcome of the trial would have been different if counsel had objected to sleeping jurors and the evidence against the defendant was overwhelming). Accordingly, Nelson is not entitled to relief on Ground Four.

**E.     Ground Five: Whether counsel was ineffective for failing to advise him adequately of his right to testify**

Nelson argues that counsel was ineffective for failing to prepare him to testify on his own behalf.  In his affidavit, he states that he wanted to testify in order to explain his limited involvement in OWN GOLD; however, counsel advised him he did not need to testify because the government's case "had not gone well."  Nelson contends that this advice was not strategic, but rather, given to him because counsel failed to prepare him to testify.  Civ. Doc. 9 at 23–24.  Counsel disputes Nelson's assertions.  Civ. Doc. 16-1 at 3–4 and 8.

During trial, the district court questioned Nelson about his decision not to testify (Crim. Doc. 431-9 at 115–18):

| THE COURT: | Mr. Nelson, you're under oath.  You must give truthful answers to the questions that are asked.  If you give false answers, you face penalties of perjury, false statement and obstruction. |
| --- | --- |
| | Do you understand that? |
| NELSON: | Yes, ma'am, I do. |
| | . . . |
| THE COURT: | Your lawyer has advised the Court that it is your intent not to present testimony or witnesses in defense of the charges that the Government has brought against you beyond that evidence and testimony that your lawyer has elicited so far by cross-examination of the Government's witnesses and beyond that that they might present in cross-examination of the witnesses presented by Mr. Skillern and in the entry of documents in connection with that cross-examination. |
| | Do you understand that? |
| NELSON: | I do, yes, ma'am. |
| THE COURT: | Under the Constitution of the United States, you're entitled to present a full defense, you're |

15

entitled to have Counsel represent you in that defense, you're entitled to testify on your own behalf, if you wished to testify.  You're also entitled, as you know, not to testify so as not to have the possibility of incriminating yourself.

By making a decision not to present a defense, you're giving up your right to present such a defense.  In that case, the jury will be left to consider your guilt or innocence based solely upon the evidence that the Government has introduced and your lawyer's introduction of minimal evidence in cross-examination of the witnesses presented by the Government and others.

Do you understand that?

NELSON:            Yes, ma'am, I do.

                   . . .

THE COURT:         Have you had a full opportunity to discuss this decision with your lawyer before you made the decision not to present a further defense or to testify?

NELSON:            Yes, ma'am, at length.

THE COURT:         Are you satisfied with the representation that your lawyer has provided you with respect to that issue?

NELSON:            Extremely so.

THE COURT:         Do you have any questions about this issue for the Court?

NELSON:            No, ma'am, none.

                   . . .

THE COURT:         Mr. Nelson, in your own words, sir, could you please tell the Court what you're deciding to do with respect to a decision not to present a defense and not to testify?

NELSON:            Yes, ma'am.  The evidence has been presented thus far, I'm confident in what has been presented in my behalf and I have chosen not to testify.

16

"Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992) (*en banc*).  Counsel renders ineffective assistance of counsel when he refuses to accept the defendant's decision to testify and does not call him to the stand, or when he never informs the defendant of his right to testify and that the decision whether to testify belongs to the defendant alone. *Id.* at 1534.

The record conclusively refutes Nelson's assertion that counsel's advice deprived him of his constitutional right to testify.  Nelson swore under oath that (1) he was aware of his right to testify, (2) he had discussed the issue with his lawyers "at length," and (3) he was "extremely" satisfied with his counsel's representation on this issue.  "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 421 U.S. 63, 74 (1977). Nelson fails overcome the strong presumption that these statements under oath were false. *See Marquez v. United States*, 684 F. App'x 843, 866 (11th Cir. 2017) (affirming the denial of a Section 2255 motion without an evidentiary hearing when the defendant told the court that he had decided not to testify after he had discussed his rights and options with counsel).[2]

Furthermore, Nelson fails to demonstrate prejudice.  Although he contends that "it was important for the jury to hear" his testimony about his limited involvement in Own Gold (Civ. Doc. 8 at 2) and that such testimony was "critical to his defense" (Civ. Doc. 7 at 10), he stops short of arguing that counsel refused to accept his decision to testify, or that his testimony would have resulted in acquittal. *Broomfiled v. United States*, 2018 U.S. App. LEXIS

---

[2] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

29449, at *6 (11th Cir. Oct. 18, 2018) (denying a certificate of appealability when the district court informed the defendant of his right to testify and he acknowledged his understanding of his rights and the defendant "offered only a conclusory assertion that his testimony would have resulted in an acquittal").  Nelson describes the testimony he would have offered, but he fails to argue how the proposed testimony would have caused the jury to render a different verdict in light of trial evidence that established his guilt.   Accordingly, Nelson is not entitled to relief on Ground Five.

### F.    Ground Six: Whether counsel was ineffective at sentencing

Nelson raises the following six claims concerning counsel's ineffectiveness at sentencing: (1) that counsel's failure to object to the reasonableness of the sentence was prejudicial and not strategic; (2) that counsel failed to challenge the loss amount attributable to Nelson, (3) that counsel failed to challenge the sentence as unreasonable, (4) that counsel failed to argue that longer sentences lead to greater recidivism based on recidivist data from the Sentencing Commission, (5) that counsel failed to argue effectively that his criminal history was overstated, and (6) that counsel failed to argue effectively for a reduced sentence based on his post-traumatic stress disorder ("PTSD").  Civ. Doc. 7 at 12.

#### 1.    Sentencing Claims 1 and 3

Nelson asserts that counsel was ineffective for failing to challenge his sentence as unreasonable.  He contends that his sentence is disproportionately larger than the sentence received by co-conspirator Cassim and is greater than necessary considering his individual characteristics.  Civ. Doc. 9 at 26 and 28–29.

Nelson fails to demonstrate that counsel's performance at sentencing was deficient or that he was prejudiced.  Counsel asserted many of the arguments that Nelson now complains

about, including that his role in the conspiracy was minor compared to Cassim's role, that he was twice terminated from Own Gold, that he did not create Own Gold's website, that he did not mail certificates of ownership to investors, that he suffered from PTSD, that he was naive, that he had a low risk of recidivism, that he tried to make Own Gold successful, that his criminal history category was overstated, and that he was a honorably-discharged veteran. Crim. Doc. 417 at 10–21.

The district court granted a variance based on many of counsel's arguments.  The district court explained, "[t]o the extent that this sentence reflects a variance under the 3553 factors, it is so to consider the Defendant's prior military service, his lack of a reasonable opportunity to be recidivist in this matter upon completion of this sentence just imposed, his advanced age, and health conditions, as well as to avoid disparity in sentencing." Crim. Doc. 417 at 57.  The sentence was reasonable and well-supported.  Consequently, Nelson's claim lacks merit because he fails to demonstrate what more counsel could have argued to support a shorter or more proportionate sentence.  Nelson also fails to show he was prejudiced because the district court, in fact, considered many of counsel's arguments when imposing the sentence.

### 2.    Sentencing Claim 2

Nelson asserts that counsel was ineffective for failing to seek exclusions from the loss calculation for the nine months when he was not employed at Own Gold.  He argues that counsel should have requested an evidentiary hearing to identify funds Own Gold obtained during his absences.  Civ. Doc. 9 at 27–28.  At sentencing, counsel began to argue that "there was a time when [Nelson] was fired" and "not dealing with the affairs of the Own Gold company when a large sum of money came in," which could affect the loss calculation.

However, immediately thereafter, Nelson withdrew this objection. Addressing him directly, the district court asked, "You are withdrawing that objection, Mr. Nelson?" to which he responded, "yes." Crim. Doc. 417 at 33–34.

"[T]he district court may hold all participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Dabbs*, 134 F.3d 1071, 1082 (11th Cir. 1998). To prove withdrawal from a conspiracy, "the defendant has the substantial burden of proving: (1) that he has taken affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy; and (2) that he made a reasonable effort to communicate those acts to his co-conspirators or that he disclosed the scheme to law enforcement authorities." *United States v. Starrett*, 55 F.3d 1525, 1550 (11th Cir. 1995). "A mere cessation of participation in the conspiracy is insufficient to prove withdrawal." *Dabbs*, 134 F.3d at 1083 (holding that a defendant's mere "physical distance from, rather than his repudiation of, the actions of his co-conspirators" did not constitute withdrawal).

Nelson fails to identify any argument or evidence that demonstrates his withdrawal from the conspiracy. Nelson contends that he "had one or more conversations [with co-conspirator Skillern] about [Nelson's] desire to be removed as an officer or owner." Civ. Doc. 8 at 5. However, he fails to assert that he communicated to his co-conspirators that he wished to terminate his involvement in the conspiracy during his absence from Own Gold, or at any other time. Nor does he identify any act by him to thwart or disrupt the objectives of the conspiracy. The district court observed at the sentencing hearing that "[t]here was never a period in the scheme that the Jury found [Nelson] not to be a participant or the subject, and therefore, there will not be a time when he wouldn't be responsible for the full amount of the

loss." Crim. Doc. 417 at 22. Consequently, Nelson fails to demonstrate he was prejudiced by counsel's (and his own) decision not to seek a loss reduction. *See United States v. Carrazana*, 362 F. App'x 973, 977 (11th Cir. 2010) (affirming the district court's loss determination that the defendant was responsible for losses that accrued after he left employment because "there [was] no evidence that [the defendant] took any action to thwart or disrupt the objectives of the conspiracy").

### 3.   Sentencing Claim 4

Nelson asserts that counsel failed to argue that longer sentences lead to greater recidivism based on recidivist data from the Sentencing Commission. Nelson presents a one-page document titled "Recidivism and Sentences Imposed," which states that "[o]ffenders with shorter lengths of imprisonment generally had lower recidivism rates." Civ. Doc. 9 at 35.

Even assuming this document's authenticity, Nelson cannot show that counsel was ineffective in failing to reference recidivism data from the Sentencing Commission, or that counsel's performance prejudiced him. Nelson does not explain how this data would have impacted the length of his sentence. In fact, the district court considered that Nelson would be unlikely to recidivate when imposing the sentence. The district court considered "his lack of a reasonable opportunity to be recidivist" when imposing the sentence. Crim. Doc. 417 at 57. Nelson does not show that no competent counsel would have failed to present this recidivism data, or that his sentence would have been shorter had counsel presented this data.

### 4.   Sentencing Claim 5

Nelson asserts that counsel failed to effectively challenge his criminal history category. He contends that his criminal history category of III resulted from traffic offenses and

overstates both the seriousness of his past criminal conduct and his propensity to commit crimes.  Civ. Doc. 9 at 30.  In a sentencing memorandum and during the sentencing hearing, counsel urged the district court to consider that Nelson's two prior DUI offenses were misdemeanors that did not result in any injury and that he committed no prior crimes of violence.  Crim. Doc. 329 at 7–8; Crim. Doc. 417 at 17.

Nelson's fails to demonstrate what more counsel could have argued to challenge his criminal history category, or that he was prejudiced by counsel's performance.  Notably, Nelson does not dispute the accuracy of the presentence report concerning his DUI offenses.  "The mere fact that counsel was unsuccessful in making certain arguments, does not, without more, direct a finding that counsel's performance was constitutionally deficient." *United States v. Walker*, No. 3:08-cr-87, 2015 WL 4389939, at *8 (N.D. Fla. July 15, 2015); *Ward v. Hall*, 592 F.3d 1144, 1164 (11th Cir. 2010) ("The fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel").

### 5.    Sentencing Claim 6

Nelson asserts that counsel failed to argue effectively for a reduced sentence based on his PTSD.  In a sentencing memorandum and at sentencing counsel urged the district court to consider that Nelson suffers from depression and PTSD.  Crim. Doc. 329 at 9; Crim. Doc. 417 at 18. Counsel presented a psychological evaluation of Nelson, which concluded that Nelson "does, in fact, have a history of clinically significant symptoms of PTSD."  Crim. Doc. 344-1 at 11.  In granting a variance, the district court explained that it considered Nelson's "health conditions."  Crim. Doc. 417 at 57.  Nelson's claim lacks merit because he fails to demonstrate what more counsel could have argued to support a reduced sentence

based on his PTSD.  Nelson also fails to show he was prejudiced because the district court, in fact, considered his health when imposing the sentence.

Each of Nelson's sentencing claims fails.  Accordingly, he is not entitled to relief on Ground Six.

### G.  Ground Seven: Whether appellate counsel was ineffective

Nelson argues that appellate counsel was ineffective for failing to raise the following issues: (1) that jurors were sleeping during the trial, (2) that the district court committed sentencing errors and the sentence was unreasonable, and (3) that "the two instances of alleged misrepresentations touted by the prosecution as proof of [his] fraudulent intent were in fact not made, crafted, or approved by Nelson."  He argues that these issues were "clearly stronger" than the issues appellate counsel raised.  Civ. Doc. 7 at 14.

Nelson raised the following issues on direct appeal: (1) that he should have been acquitted of all counts because the jury was required to accept his argument that he relied in good faith on the advice of an attorney, (2) that the evidence supporting the mail fraud counts was insufficient, and (3) that the evidence of his intent to defraud was insufficient.  The circuit court ruled that all of these issues "boil down to sufficiency-of-the-evidence challenges" and summarily rejected them.  *Nelson*, 884 F.3d at 1110.

"[The] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)).  "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citation omitted).  Furthermore, "[a]ppellate counsel has

23

no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments." *Overstreet v. Warden*, 811 F.3d 1283, 1287 (11th Cir. 2016). "It is also crystal clear that there can be no showing of actual prejudice from an appellate attorney's failure to raise a meritless claim." *Brown v. United States*, 720 F.3d 1316, 1335 11th Cir. 2013).

Nelson fails to demonstrate that the issues he raises now are "clearly stronger" than those raised by appellate counsel or that he was prejudiced by appellate counsel's performance. As previously explained, Nelson was not prejudiced by alleged sleeping jurors, and his sentencing arguments lack merit. Consequently, appellate counsel was not ineffective for not raising these meritless claims. Furthermore, Nelson's third proposed appellate challenge to the government's evidence of Nelson's fraudulent intent is a sufficiency-of-the-evidence issue, which the circuit court already flatly rejected. Accordingly, Nelson is not entitled to relief on Ground Seven.

## III.   Need for Evidentiary Hearing

A district court deciding a Section 2255 motion may "order . . . its summary dismissal '[i]f it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief[.]'" *Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2003) (quoting 28 U.S.C. § 2255). No hearing is required when the record establishes that a Section 2255 claim lacks merit, *United States v. Lagrone*, 727 F.2d 1037, 1038 (11th Cir. 1984), or that it is defaulted, *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Nelson has not established the need for an evidentiary hearing. *Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir. 1984) (*en banc*).

IV.     **Conclusion**

Accordingly, Nelson's *pro se* Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Civ. Doc. 7) is **DENIED**.  The **CLERK** is directed to enter a judgment against Nelson, to **CLOSE** this case, and to enter a copy of this order in the criminal action.

**DENIAL OF BOTH A CERTIFICATE OF APPEALABILITY
AND LEAVE TO APPEAL *IN FORMA PAUPERIS***

Nelson is not entitled to a certificate of appealability ("COA").  A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition.  28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a COA.  Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  To merit a certificate of appealability, Nelson must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001).  Nelson has not shown that reasonable jurists would debate either the merits of the claims or the procedural issues.  Accordingly, a certificate of appealability is **DENIED**.  Leave to appeal *in forma pauperis* is **DENIED**.  Nelson must obtain permission from the circuit court to appeal *in forma pauperis*.

**DONE and ORDERED** in Chambers in Tampa, Florida, this 26th day of April, 2021.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE